IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

ALICIA GOOLSBY,              :
                                  :
        Plaintiff,           :
                                    :        CIVIL ACTION
v.                          :        No. 3:22-CV-82 (CAR)
                                    :
CITY OF MONROE, GEORGIA,   :
                                  :
        Defendant.     :
_____:

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Alicia Goolsby brings this action against her former employer, the City of Monroe, Georgia ("the City"), alleging the City unlawfully terminated her based on her race and in retaliation for filing an EEOC complaint in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1] The City moves for summary judgment on all claims. Having carefully considered the parties' arguments, the record, and applicable law, the Court finds no genuine issues of material fact exist as to either claim and hereby **GRANTS** the City's Motion [Doc. 35].

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine issue

---

[1] Plaintiff originally filed suit against the City, City Finance Director Beth Thompson, and City Human Resources Director Les Russell asserting employment discrimination, retaliation, disparate impact, and hostile work environment claims under Title VII, 42 U.S.C. § § 1981, 1983, and § 1985. The Court dismissed all claims against Thompson and Russell and dismissed her Title VII disparate impact and hostile work environment claims against the City. [Docs. 21 and 28]. Thus, only her Title VII disparate treatment and retaliation claims against the City based on her EEOC charge dated September 7, 2020, are before the Court.

as to any material fact and the movant is entitled to a judgment as a matter of law."[2]  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.[3]  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[4]

On summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[5]  The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[6]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence creates a genuine issue of material fact or that the moving

---

[2] Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[3] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[4] *See id.* at 249-52.

[5] *See id.* at 254-55; *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[6] *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

party is not entitled to a judgment as a matter of law.[7]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[8]

## BACKGROUND

Plaintiff Alicia Goolsby, who is African American, worked as a cashier/customer service representative within the Customer Service Division of the City's Finance Department for over three years, from March 27, 2017, until the City terminated her employment on July 2, 2020. The City contends it lawfully terminated her based on her deteriorated job performance and because of complaints received from Plaintiff's co-workers and supervisors regarding her poor communication skills, attitude, and demeanor. Plaintiff, however, contends the City's reasons for termination are pretext for discrimination and retaliation: Her performance did not deteriorate; the infractions and warnings she received for policy violations were pretextual and retaliatory; and the complaints from co-workers and supervisors were "a concerted effort" to discriminate and retaliate against her.[9]

For purposes of this Motion, the material facts in the light most favorable to Plaintiff, the non-movant, are as follows:

Relevant Parties and Policies

At all times relevant to the events in this case, Logan Propes (Caucasian) served as

---

[7] *See* Fed. R. Civ. P. 56(e); *see also Celotex,* 477 U.S. at 324-26.
[8] *Avirgnan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991).
[9] Response to Motion for Summary Judgment, p. 2 [Doc. 50].

3

the City Administrator and the City's personnel administrator;[10] Les Russell (Caucasian) served as the City's Human Resources Director;[11] and Beth Thompson (Caucasian) served as the City's Finance Director.[12] The City's Finance Department contains a Customer Service Division, which includes the following positions: Customer Service Representative/Cashier; Senior Customer Service Representative/Cashier ("Senior CSR"); and Customer Service Representative Manager ("CSR Manager").[13] The Customer Service Representatives/Cashiers and Senior CSRs report to the CSR Manager, who in turn reports to the Finance Director.[14]

When Plaintiff began her employment with the City, Monica Simmons (African American) served as the CSR Manager, reporting directly to Finance Director Thompson.[15] During the beginning of Plaintiff's employment, Terrie Giles and Diane Jordan served as Senior CSRs; Plaintiff, Amy Dire, Kathleen Lewis, Caitlin Talford, Melissa Esterline, and Renee Sandoval served as Customer Service Representatives/Cashiers;[16] Hayden Stowe served as a Finance Staff Assistant responsible for recounting the cashiers' cash bags and depositing money in the bank;[17] and Debbie

---

[10] Pl. Depo., pp. 155-56 [Doc. 35-3]; Russell Depo., p. 135 [Doc. 35-4]; Propes Decl. at ¶ 2 [Doc. 35-5].
[11] Russell Depo., pp. 7-8; Pl. Depo., p. 35.
[12] Thompson Depo., pp. 6, 42 [Doc. 35-6]; Pl. Depo., p. 35; Russell Depo., p. 78.
[13] Pl. Depo., pp. 81-82; Thompson Depo., p. 35; Thompson Decl. at ¶ 3 [Doc. 35-7].
[14] Id.
[15] Pl. Depo., pp. 81-82; Russell Depo., pp. 72-73; Thompson Depo., p. 12.
[16] Giles Depo., pp. 6-7 [Doc. 35-8]; Thompson Depo., pp. 73-74; 79-81; Thompson Decl. at ¶ 4.
[17] Stowe Depo., pp. 12, 24 [Doc. 35-9].

Crowe served as an Accountant responsible for reconciling bank statements.[18]  Plaintiff and her supervisor, CSR Manager Monica Simmons, were the only African American employees in the division; all other employees were Caucasian.[19]

The City has Personnel and Operational Policies that address the City's process for announcing internal vacant employment positions and for promotional appointments.[20] Vacant internal positions must "be publicized by posting internal announcements at all City operated departmental facilities for no more than ten (10) business days…. Should no applicants meet minimum qualifications or not be selected, the vacancies for classified service shall then be publicized by posting external announcements . . . for a period of no less than ten (10) business days and/or until the vacancy is filled."[21] Promotional appointments "for approved vacant positions shall be open to all internal employees who meet the training, education, and experience requirements…. Promotional appointments may be made at the discretion of the Department head, with approval by the Personnel Administrator, without posting the job vacancy externally."[22]

<u>Start of Plaintiff's Employment</u>

In March 2017, Plaintiff began her employment with the City as a Customer Service Representative/Cashier under CSR Manager Monica Simmons, who reported to

---

[18] Thompson Depo., pp. 72, 79; Stowe Depo., p. 24; Thompson Decl. at ¶ 4.

[19] Giles Depo., pp. 6-7 [Doc. 35-8]; Thompson Depo., pp. 73-74; 79-81; Thompson Decl. at ¶ 4.

[20] Russell Decl. at ¶ 3 [Doc. 35-10]; Propes Decl. at ¶ 2.

[21]Personnel Policy, Section 5B Applications and Examinations, Announcement of Vacant Positions (Internal), Pl. Depo., Ex. 6 [Doc. 35-3, p. 135 of 243].

[22] Personnel Policy, Section 5H Promotional Appointments [Doc. 35-3, p. 136 of 243].

Finance Department Head Beth Thompson.[23] As a Customer Service Representative/Cashier, Plaintiff's duties included receiving and processing counter payments and providing information and assistance to customers.[24] She was also required to count and balance her cash drawer.[25] If a cashier's drawer is off by any amount, the cashier is required to report the shortage or overage to the CSR Manager for the discrepancy to be reconciled.[26] If a cashier's drawer is over or short by $50.00 or more, the cashier receives a formal counseling; if the shortage or overage is less than $50.00, it is noted and communicated to the cashier, but the cashier does not receive a formal reprimand.[27]

In April 2018 and August 2018, Plaintiff received two written reprimands for cash drawer discrepancies. On April 4, 2018, Plaintiff received a written counseling for a shortage of $74.50. After reconciling her drawer, no discrepancies were found, and Plaintiff was warned any additional similar incidents could result in probation.[28] On August 16, 2018, Plaintiff received a second written reprimand for a shortage of $100.00. Again, no discrepancies were found after reconciling her drawer, and Plaintiff was

---

[23] Pl. Depo., pp. 81, 86.

[24] Pl. Depo., pp. 77-79; Customer Service Representative/Cashier Job Posting, Pl. Depo. Ex. 5 [Doc. 35-3, p. 123 of 243].

[25] Pl. Depo., p. 78.

[26] Thompson Depo., pp. 56-57.

[27] Thompson Depo., pp. 56-57; Lewis Depo, p. 13 [Doc. 50-9]; Giles Depo., pp. 14, 51-52.

[28] Pl., Depo, pp. 90-91; Employee Warning Notice dated 4/4/18, Pl. Depo., Ex. 7 [Doc. 35-3, p. 174 of 243].

placed on three months' probation.[29]

Senior CSR Position Vacancy

Plaintiff and three other Customer Service Representatives/Cashiers—Amy Dire, Kathleen Lewis, and Caitlin Talford—were cross trained and would rotate weekly to perform customer service duties in a separate office.[30] Thus, for one week out of the month Plaintiff performed customer service duties in a separate office.[31]

On August 15, 2019, Simmons informed Finance Department Head Thompson that she was resigning from her position as CSR Manager.[32] According to Simmons, "it was known" that Senior CSR Terrie Giles would be promoted to the CSR Manager position, and thus, there would be an open Senior CSR position that needed to be filled.[33] Simmons states Thompson authorized her to fill the Senior CSR position and "start training them."[34] Simmons first offered the Senior CSR position to Kathleen Lewis, but Lewis declined.[35] So Simmons verbally offered the position to Plaintiff, Plaintiff accepted,[36] and Plaintiff states she immediately started working in the Senior CSR position and remained there for the two weeks before Simmons' last day on August 29,

---

[29] Pl. Depo., pp. 91-91; Employee Warning Notice dated 8/16/18, Pl. Depo., Ex. 8 [Doc. 35-3, p. 175 of 243].
[30] Pl. Depo., pp. 80-81.
[31] *Id.* at pp. 81, 100
[32] Simmons Decl. at ¶¶ 2 & 9 [Doc. 50-4].
[33] *Id.* at ¶¶ 11 & 12.
[34] *Id.* at ¶¶ 3, 4, & 15.
[35] *Id.* at ¶¶ 5 & 6.
[36] *Id.* at ¶ 7; Pl. Depo., pp. 99-100.

2019.[37]

Department Head Thompson, on the other hand, states she asked for Simmons' recommendation for the upcoming Senior CSR position, but the position was not yet available, and Simmons lacked authority under the City's personnel policies to offer the position without the approval of the Department Head and personnel administrator.[38] On August 20, 2019, Simmons emailed Thompson, writing in relevant part:

> Kathleen [Lewis] declined to come over, said she is not comfortable in customer service & likes the cashiering side. I tried to tell her she will be okay but I can't make her do what she does not want to. She would have been perfect. I talked with Alicia [Plaintiff] and she is willing to take on the CSR role.[39]

During Thompson's tenure in the Finance Department, there has never been a situation in which there was a verbal offer and acceptance for a position without an internal posting.[40]

On Thursday, August 29, 2019, Giles was promoted to CSR Manager, becoming Plaintiff's direct supervisor,[41] and the City posted an Internal Job Posting for the open Senior CSR position.[42] Plaintiff saw the job posting the next day, on Friday, August 30 around 5pm. When Plaintiff returned to work after the Labor Day holiday on Tuesday, September 3, 2019, she was confused because Amy Dire—who with Plaintiff, Lewis, and

---

[37] Pl. Depo. at pp. 100 & 104.

[38] Thompson Depo, pp. 45-46; Giles Depo., p. 53; Thompson Decl. at ¶ 5; Russell Decl. at ¶ 5.

[39] Aug. 20, 2019 Email from Simmon to Thompson, Pl. Depo., Ex. 10 [Doc. 35-3, p. 176 of 243].

[40] Thompson Depo., pp. 106-107, 115.

[41] Pl. Depo., pp. 166-67; Giles Depo., pp. 6-7; Thompson Depo., pp. 46-47.

[42] Pl. Depo., pp. 106-108; Internal Job Posting, Pl. Depo, Ex. 12 [Doc. 35-3, p. 177 of 243].

Talford had been cross trained in the position—was in the Senior CSR office.[43] Plaintiff emailed Thompson, "I was told by [Simmons] on last week that I'd be working in customer service since she offered me the CSR position. I'm trying to clarify what area am working in because [Dire] is in customer service at the moment."[44] Thompson responded:

> There must be a misunderstanding somewhere….Monica was not to offer anyone the CSR position. For one it wasn't open when she was still here & for two she would not be doing the hiring for that position. Monica, Terrie & I discussed this week since I knew we would be short handed…..Amy & Diane are in CSR this week; you, Melissa & Kathleen are in the cashier area this week.
> I am sorry if you were mis-lead into thinking you would be in CSR this week and permanently.[45]

After receiving Thompson's email, Plaintiff assumed she had to apply for the position, but when Plaintiff went to clock out for lunch on September 3, she noticed that the job posting for the Senior CSR position had been taken down.[46] Thompson stated she took the posting down because two qualified applicants, Amy Dire and Ashley Reyes, had applied for the position.[47] Plaintiff, however, believes Thompson took down the posting because she did not want Plaintiff to apply.

When Plaintiff returned from lunch, she met with HR Director Les Russell and explained how Simmons had given her the Senior CSR position, but Thompson said

---

[43] Pl. Depo., pp. 103-105; Dire Depo., p. 32 [Doc. 35-13].

[44] Sept. 3, 2019 email from Plaintiff to Thompson, Pl. Depo., Ex. 13 [Doc. 35-3, p. 179 of 243].

[45] Sept. 3, 2019 email from Thompson to Plaintiff, Pl. Depo., Ex. 13 [Doc. 35-3, p. 179 of 243].

[46] Pl. Depo., pp. 113-115; Pl. Depo, Ex. 13.

[47] Thompson Decl. at ¶ 6; Russell Depo., p. 84.

Simmons had no authority to do so.[48] Russell explained the City's policy on promotions which requires the approval of the department head and personnel director; explained that Thompson was the department head, not Simmons; asked Plaintiff to write up a statement; and said he would investigate the matter.[49]

The next day, on September 4, 2019, Plaintiff delivered Russell her complaint that she had been "discriminated against by Finance Director Beth Thompson."[50] Plaintiff stated she had applied for several positions in her tenure but "never get considered" and expressed that she thought it "strange" that the job posting was taken down after Plaintiff emailed Thompson, "not leaving [Plaintiff] enough time to apply for the position."[51]

After receiving Plaintiff's complaint, HR Director Russell met with Finance Department Head Thompson to discuss Plaintiff's allegations, and it was ultimately decided to re-post the Senior CSR position "to allow [Plaintiff] to apply for the opportunity."[52] The Senior CSR position was then re-posted through September 12, 2019.[53]

Three employees applied for the re-posted position—Amy Dire, Ashley Reyes,

---

[48] Pl. Depo, p. 120.

[49] Pl. Depo., pp. 120-22; Russell Depo., p. 62.

[50] Pl. Depo, Ex. 15 [Doc. 35-3, p. 182 of 243].

[51] *Id.* at pp. 182-83.

[52] Russell Depo., pp. 137-38, 144.

[53] Pl. Depo, Ex. 17 [Doc. 35-3, pp. 184 of 243].

and Plaintiff.[54] The City conducted interviews and gave a written test for the position.[55] The interviews were conducted by a three-person panel—HR Director Russell, CSR Manager Giles, and Utilities Billing Clerk Sharon Griffin (African American).[56] Based on the results of the interview and the written test, Dire scored the highest and was ultimately selected for the Senor CSR position.[57] Plaintiff scored the second highest.

<u>Plaintiff's Grievance Hearing and EEOC Charge Regarding the Senior CSR Position Selection Process</u>

On October 10, 2019, Plaintiff emailed HR Director Russell requesting to meet and expressed that she did not feel the selection process for the Senior CSR position had been fair.[58] Russell and City Administrator Logan Propes investigated Plaintiff's allegations and found no issues with the selection process.[59] Plaintiff ultimately requested a formal grievance hearing before the Mayor and City Council, which was held on November 12, 2019.[60] After the evidence was presented at the hearing, the Mayor and City Council moved that the committee take no action with respect to the grievance, confirmed the decision to uphold the hiring of Amy Dire as Senior CSR, and found no discrimination

---

[54] Pl. Depo., pp. 126-27, 129-30; Giles Depo., p. 27.
[55] Pl. Depo., pp. 131, 137.
[56] Pl. Depo., pp. 131-32; Dire Depo., p. 10.
[57] Thompson Depo., p. 50.
[58] Pl. Depo., pp. 146-48; Ex. 19; Russell Depo., p. 147, Ex. 19.
[59] Pl. Depo., p. 158; Russell Decl. at ¶ 7; Propes Decl. at ¶ 6.
[60] Pl. Depo., Exs. 21 & 22.

occurred.[61]

On December 12, 2019, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging the City discriminated against her because of her race and retaliated against her for her complaints about the Senior CSR position.[62] When HR Director Russell received notice of Plaintiff's Charge, he again investigated the matter and against determined there was no "evidence that anything was being racially motivated."[63] Plaintiff did not file a lawsuit based on this EEOC Charge within 90 days of receipt of the Dismissal and Notice of Right to Sue.[64]

Events Leading to Plaintiff's Termination

A week after filing the EEOC Charge, on December 19, 2019, Plaintiff received two counseling infractions. CSR Manager Giles gave Plaintiff a written counseling record for a policy violation when she falsified her time records.[65] Plaintiff filled out a "Worked thru lunch or short lunch" form indicating she took a 30-minute lunch, but security cameras showed she took an hour-long lunch.[66] Giles also gave Plaintiff a verbal counseling record for unsatisfactory job performance when "did not follow the chain of command with an email to the Mayor asking to be educated on several questions related to her

---

[61] *Id.*
[62] Pl. Depo., Ex. 1.
[63] Russell Depo., pp. 45-47.
[64] Pl. Depo., p. 28.
[65] Dec. 19, 2019 Counseling Record, Pl. Depo., Ex. 23; Pl. Depo., pp. 167-69; Giles Depo., p. 55.
[66] *Id.*

position."[67] She received only warnings for these counselings; she was not suspended and received no loss of pay.

The next day, on December 20, 2019, Plaintiff submitted a complaint about CSR Manager Giles to Human Resources. Plaintiff felt Giles was creating a hostile work environment, was subjecting Plaintiff to intimidation, and was retaliating against Plaintiff for filing the EEOC complaint.[68]

On January 7, 2020, Giles gave Plaintiff a written counseling record for a policy violation when her cash drawer had an overage of $530.80.[69] On February 21, 2020, Giles reminded Plaintiff by email that she was not to clock out and leave the lobby without any cashiers to attend to a customer in the lobby.[70] On March 30, 2020, Debbie Crowe, an Accountant for the City, emailed Plaintiff and Giles regarding a $0.12 cent coin discrepancy in her bag.[71] On April 14, 2020, Crowe reported that Plaintiff's cash bag had an overage of $20.00.[72] On June 5, 2020, Finance Staff Assistant Hayden Stowe emailed Department Head Thompson and CSR Manager Giles that Plaintiff's cash bag had a shortage of $20.00 on June 4 and an overage of $40.00 on June 5.[73] Plaintiff received no counseling record or any other reprimand for these issues. At the end of her email Stowe

---

[67] Counseling Record, Pl. Depo., Ex. 24.

[68] Dec. 20, 2019 Complaint to HR, Pl. Depo, Ex. 25 [Doc. 35-3, p. 233 of 243].

[69] Jan. 7, 2020 Counseling Record, Pl. Depo., Ex. 26 [Doc. 35-3, p. 234 of 243].

[70] Feb. 21, 2020 email to Plaintiff from Giles, Pl. Depo., Ex. 27 [Doc. 35-3, p. 237 of 243].

[71] March 30, 2020 email to Plaintiff from Crowe, Pl. Depo., Ex. 27 [Doc. 35-3, p. 236 of 243].

[72] April 14, 2020 email from Crowe to Thompson, Giles, and Dire, Pl. Depo, Ex. 28 [Doc. 35-3, p. 238 of 243].

[73] June 5, 2020 email from Stowe to Thompson and Giles, Pl. Depo., Ex. 29 [Doc. 35-3, p. 239 of 243].

wrote, "Not keeping tabs on anyone. . Just risk management…😊"[74] On June 26, 2020, as part of her routine practice, Giles conducted a random drawer check and found Plaintiff had prematurely put her money till in the vault at 3:36p.m. and it had a $3.60 overage.[75] By placing her money in the vault before City Hall closes at 5:00pm and failing to report an overage or shortage, no matter the amount, Plaintiff violated City policies.[76]

After Plaintiff was not selected for the Senior CSR position, Thompson, Giles, Russell, Dire, and Talford felt there was a shift in Plaintiff's demeanor and attitude toward her co-workers.[77] Giles testified she received multiple complaints from her subordinates about Plaintiff's dismissive attitude and poor communication.[78] On or around June 25, 2020, Customer Service Representative/Cashier Caitlin Talford approached HR Director Russell about the tense atmosphere amongst the cashiers and customer service representatives.[79] Talford and Thompson submitted written complaints to Russell about Plaintiff being "extremely rude"; creating "a hostile and toxic work environment"; having "a hateful attitude"; and not being receptive to help.[80] Thompson stated she had received complaints from "several of the employees" about Plaintiff's attitude and had never received similar behavioral complaints about any other cashiers

---

[74] *Id.*

[75] June 26, 2020 note from Giles, Pl. Depo., Ex. 33 [Doc. 35-3, p. 240 of 243].

[76] Giles Depo., pp. 37-39; Pl. Depo., pp. 89-90.

[77] Russell Depo., pp. 40-41; Giles Depo., p. 23; Dire Depo., pp. 11-12; Talford Depo., pp. 9, 12 [Doc. 50-12]; Thompson Decl. at ¶ 8; Giles Decl. at ¶ 7.

[78] Giles Depo., pp. 42-43; Giles Decl. at ¶ 7.

[79] Russell Depo., pp. 35-36; 55; 188.

[80] Talford Depo., pp. 15-16, Ex. 1; Thompson Depo., p. 71, Ex. 1.

or customer service representatives.[81]

On June 25 and 26, Russell investigated the team member complaints in the cashier/customer service area.[82] He interviewed "multiple individuals in the customer service and cashier area" about morale and business issues and summarized "some of the most important statements" from eight of Plaintiff's team members, some of whom submitted written statements, in a document to City Administrator Logan Propes.[83] Russell ultimately concluded that Plaintiff "continues to harbor an ill feeling against the team and particularly Terrie Giles, predicated on the decision not to promote her and to promote Amy Dire. The morale continues to suffer and the [C]ity is at risk of losing valuable associates in the process. Based on the job performance issues and the statements from some of the cashier associates that it is an unpleasant work environment, I would recommend that we give Beth Thompson and Terrie Giles the right to terminate [Plaintiff]."[84] Russell did not interview Plaintiff.

On July 2, 2020, Russell and Thompson met with Plaintiff to inform her the City was terminating her employment.[85] In Plaintiff's termination letter, Thompson wrote:

> After carefully considering all available facts and circumstances, I have determined that it is in the City of Monroe's best interest that your employment with the City be terminated, effective immediately. The City has lost confidence in your ability to consistently perform your duties at an

---

[81] Thompson Depo., pp. 71, 116, 131-32.
[82] June 26, 2020 Memo from Russell to Propes, Pl. Depo., Ex. 34 [Doc. 35-3, pp. 241-42 of 243].
[83] *Id.*
[84] *Id.*
[85] Pl. Depo., pp. 200-201; Russell Depo., p. 58; Thompson Depo., p. 16.

15

acceptable level and treat your co-workers in a professional manner.

You have been counseled numerous times, both verbally and in writing, over the past several months about your job performance. During the last week, you have again had an issue with your till being unbalanced. This week, you accepted payment from a customer, but failed to process and document the payment properly. As a result, the City's Code enforcement Department believed the account was delinquent and sent a letter to the customer.

Due to the recurrent issues and your failure to respond by improving your own performance, the City lacks all confidence that additional counseling or corrective action will result in a change in your performance.

I wish you all the best in your future endeavors. Contact Human Resources to obtain any necessary paperwork and to turn in all City property you have in your possession or control.[86]

Plaintiff states she did not receive this letter and saw it for the first time after she was terminated.

The City did not replace Plaintiff following her termination because following COVID-19, many of the cashier duties were automated, resulting in the City opting not to fill that cashier position.[87] On September 7, 2020, Plaintiff filed a second Charge of Discrimination with the EEOC for race discrimination and retaliation.[88] One of the allegations in her EEOC Charge and in her Complaint is that her white co-workers could see greater extensions than her on Wufoo, a software the City uses to collect data from

---

[86] Termination Letter, Pl. Depo., Ex. 35 [Doc. 35-3, p. 243].

[87] Thompson Decl. at ¶ 10; Giles Decl. at ¶ 10.

[88] Pl. Depo., p. 29, Ex. 3.

customers starting new services.[89]

Plaintiff was terminated over six months (203 days) after she filed her initial EEOC charge on December 12, 2020. Although other customer service/cashiers had been counseled for shortages and overages in their money drawers, Plaintiff had more errors than any of the others.[90] Lewis, Talford, and Dire each testified they had been counseled one time for shortages or overages in their money drawers[91]; Esterline testified she had been counseled two to three times[92]; and Sandoval testified she had been "written up" two times.[93]

## DISCUSSION

I.    PLAINTIFF'S TITLE VII DISCRIMINATION AND RETALIATION CLAIMS ARE LIMITED TO ACTIONS ARISING WITHIN 180 DAYS OF PLAINTIFF'S SEPTEMBER 7, 2020 EEOC CHARGE

Title VII requires that, in "non-deferral" states such as Georgia, an individual must file an EEOC Charge within 180 days of an alleged unlawful employment practice.[94] "Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."[95]

---

[89] Pl. Depo., p. 197, Ex. 3; Compl. at ¶ 14.

[90] Russell Depo., p. 112; Stowe Depo., p. 16; Thompson Decl. at ¶ 7; Giles Decl. at ¶6.

[91] Lewis Depo., p. 12; Talford Depo., pp. 7-8; and Dire Depo., p. 45.

[92] Esterline Depo., pp. 14-15 [Doc 35-12].

[93] Sandoval Decl. at ¶24 [Doc. 50-13].

[94] 42 U.S.C. § 2000-e-5(e); 29 C.F.R. § 1613(a)(1); *Ledbetter v. Goodyear Tire and Rubber Co., Inc.,* 421 F.3d 1169, 1178 (11th Cir. 2005).

[95] *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002).

It is undisputed Plaintiff did not file suit within 90 days of her receiving her first Right to Sue Letter on her first EEOC Charge filed on September 2, 2019. Thus, Plaintiff cannot maintain a Title VII claim against the City for failing to promote her to the Senior CSR position, as it is procedurally barred.[96] Plaintiff filed her second EEOC Charge on September 7, 2020.[97] Plaintiff concedes that the only actionable discrete discriminatory acts that can form the basis of her Title VII discrimination and retaliation claims must fall within March 11, 2020, and September 7, 2020.

Thus, Plaintiff is barred from basing her discrimination and retaliation claims on the City's failure to promote her to the Senior CSR position and the December 19, 2019 and January 7, 2020 counselings. But these time-barred acts may be used as background evidence to support her timely claims.[98]

## II.    DISCRIMINATORY TERMINATION CLAIM

Because Plaintiff seeks to prove her Title VII discrimination claim through circumstantial evidence, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*[99] guides the Court's analysis.[100] Under this framework, a plaintiff must first establish a *prima facie* case by establishing "facts adequate to permit an inference of

---

[96] *See, e.g., Green v. Union Foundry Co.*, 281 F.3d 1229 (11th Cir. 2002).

[97] It is undisputed Plaintiff failed to timely file suit following her initial December 12, 2020 EEOC Charge.

[98] *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 113.

[99] 411 U.S. 792 (1973).

[100] *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (Title VII); *Liebman v. Metropolitan Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (ADEA).

discrimination."[101]  If the plaintiff establishes her *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse employment action.[102]  If the employer meets this "exceedingly light" burden, then the inference of discrimination is erased, and the burden shifts back to the plaintiff, who must show that the employer's proffered reasons were merely pretext for discrimination.[103] Importantly, the ultimate burden of persuasion remains on the plaintiff all times.[104]

### 1.  *Prima Facie* Case

Title VII prohibits an employer from discharging or otherwise discriminating against any individual because of such individual's race.[105] To establish a *prima facie* case of discriminatory discharge under Title VII, Plaintiff must generally show she (1) is a member of a protected class; (2) was qualified for her job; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly situated individual outside her protected class or was replaced by a person outside of her protected class.[106] It is undisputed Plaintiff meets the first two prongs—she is a member of a protected class, and she was qualified for her position.

---

[101] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[102] *Cleveland*, 369 F.3d at 1193.

[103] *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

[104] *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

[105] 42 U.S.C. § 2000e-2(a)(1).

[106] *See, e.g.*, *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

It is also undisputed that Plaintiff suffered an adverse employment action when the City terminated her on July 2, 2020. But Plaintiff also argues she suffered the following adverse employment actions: (1) the two counselings she received in December 2019; (2) that white cashiers had greater permissions in Wufoo Forms Software than Plaintiff; and (3) that Ms. Giles was rude and uncivil to her, and she was being "left out" of certain communications about workflow. Although these actions may be used as evidence to support a discrimination claim, they do not independently constitute adverse employment actions upon which Plaintiff can base a disparate treatment claim under Title VII. As set forth above, the counselings Plaintiff received in December 2019 are time-barred, and Plaintiff has failed to show that white cashiers having greater permissions in the Wufoo software, Giles' alleged rudeness, and being "left out" of workflow communications caused Plaintiff to suffer a tangible adverse effect in the terms, conditions, or privileges of employment.

An adverse employment action for a Title VII discrimination claim is one that causes "a *serious and material* change in the terms, conditions, or privileges of employment."[107] "Whether the action is serious and material is not subjective; rather, 'the employment action must be materially adverse as viewed by the reasonable person in the

---

[107] *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

circumstances.'"[108] Even assuming Plaintiff did, in fact, have less permissions in the Wufoo

software than her white co-workers, nothing in the record shows the differences had any

tangible adverse effect on Plaintiff's employment. Defendant's stated reasons for Plaintiff's

termination were based on violations of City policies, errors with her cash drawer, and her

failure to treat co-workers in a professional manner.[109] Likewise, no evidence shows how

Giles' alleged rudeness or Plaintiff not being included in workflow conversations had any

tangible adverse effect on her employment or that these actions were anything more than

personality conflicts and petty slights.

Although Plaintiff suffered an adverse employment action when she was

terminated, Plaintiff fails to establish a prima facia case of discrimination because no

evidence shows she was replaced by a person outside of her protected class or treated less

favorably than a similarly situated individual outside her protected class. Plaintiff does not

dispute that the City did not replace her following her termination, as the City never

returned to having five cashiers. Plaintiff's contention the City replaced her with Amy Dire

is meritless. At the time Plaintiff was terminated, which is the relevant time period,

Plaintiff served as Customer Service Representative/Cashier, while Amy Dire served as

---

[108] *Bhuiyan v. PNC Bank, National Association*, 2023 WL 2733510, *4 (11th Cir. 2023) (quoting *Davis*, 245 F.3d at 1239).

[109] *See Hall v. Dekalb Cnty. Gov't*, 503 F. App'x 781, 788 (11th Cir. 2013) (finding that even if black employees' access to building automation system was more limited than other employees, such limitation did not cause a reduction in pay, change in work hours or benefits, change in work assignments, or other tangible harm; thus, the allegedly limited use was not an adverse action).

Senior CSR. Again, Plaintiff's Title VII claim rests on the City's termination of her employment, not its failure to promote her to the Senior CSR position.

Plaintiff also fails to establish that the City treated similarly situated employees outside her protected class more favorably. "To satisfy the fourth element of the *McDonnell Douglas* prima facie case, a plaintiff must show that [s]he and h[er] comparators were 'similarly situated in all material respects.'"[110] "Although this is a case-specific inquiry, a similarly situated comparator ordinarily will have: (1) engaged in the same basic conduct or misconduct; (2) been subject to the same employment policy, guideline, or rule; (3) had the same supervisor; and (4) shared a similar employment or disciplinary history."[111] "[T]he quantity and quality of the comparator's misconduct must be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[112] "The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."[113] Here, none of Plaintiff's co-workers are sufficiently similar to qualify as suitable comparators.

---

[110] *Blash v. City of Hawkinsville*, 856 F. App'x 259, 264 (11th Cir. 2021) (quoting *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc)).

[111] *Id.*

[112] *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *see also Burke-Fowler*, 447 F.3d at 1323.

[113] *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008).

Plaintiff argues Amy Dire is a similarly situated comparator because she was promoted while Plaintiff was "demoted."[114] But again, any claim that the City unlawfully replaced Plaintiff with Ms. Dire is administratively barred. Plaintiff must point to a similarly situated comparator that engaged in the same or similar misconduct as Plaintiff yet was treated more favorably. During the two years before Plaintiff was terminated, she received four formal counselings for job performance infractions and five other informal notices related to issues with her cash drawer, five of which occurred in the six months before her termination. Moreover, during HR Director Russell's investigation into the working environment of the customer representatives and cashiers, Plaintiff's coworkers complained of Plaintiff's dismissive attitude and poor communication. Department Head Thompson had never received similar behavioral complaints about any other cashiers or customer service representatives, and they were concerned the City risked losing valuable employees. The record shows no employee who shared a materially similar disciplinary history, who had a similar number of performance-related infractions, and who also received multiple behavioral complaints from his or her co-workers that the City did not terminate. Thus, Plaintiff fails to establish a *prima facie* case of race discrimination under Title VII.

### 2. Pretext

Even if Plaintiff could establish a *prima facie* case of discrimination under Title VII,

---

[114] Pl. Response to Motion for Summary Judgment, p. 16 [Doc. 50].

the City has articulated legitimate, nondiscriminatory reasons for terminating Plaintiff—her multiple performance-related issues and co-worker complaints. Thus, to survive summary judgment, Plaintiff must present sufficient evidence to create a genuine issue of material fact that the City's reasons are merely pretext for unlawful race discrimination. Plaintiff has failed to meet this burden. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions."[115]

To establish pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that reasonable factfinder could find them unworthy of credence."[116] The plaintiff must rebut the employer's proffered reasons "head on" and cannot succeed by "quarreling with the wisdom" of the reasons.[117] A plaintiff cannot show pretext by simply showing that the employer was incorrect in its decision; rather if the employer honestly believed that the employee engaged in misconduct, even if it was mistaken in such a belief, then the plaintiff's discrimination claim cannot succeed. "An employer 'may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or

---

[115] *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quotations and citation omitted).

[116] *Jones v. Gulf Coast Health Care of Del., LLC*, (11th Cir. 2017) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

[117] *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

retaliatory] reason.'"[118] The inquiry into pretext is concerned with the employer's beliefs, not the employee's perceptions of her performance.[119]

The Court "must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees."[120] "The question to be resolved is not the wisdom or accuracy of [the City's] conclusion that [Plaintiff's] performance was unsatisfactory, or whether the decision to fire her was 'prudent and fair.'"[121] Instead, "our sole concern is whether unlawful discriminatory animus motivated the decision."[122] This Court does not "sit a super-personnel department that reexamines an entity's business decisions."[123]

Plaintiff essentially quarrels with the City's decision and fails to establish a genuine issue of material fact showing Defendant's decision to terminate Plaintiff was merely pretext for race discrimination. No reasonable juror could find the City's reasons for terminating Plaintiff are unworthy of credence or were motivated by any discriminatory animus based on race.

Plaintiff contends the City's allegations of her poor performance and demeanor

---

[118] *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1341 (11th Cir. 2023) (quoting *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc)).

[119] *Holifield*, 115 F.3d at 1565.

[120] *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)).

[121] *Id.*

[122] *Id.*

[123] *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) (quotation omitted).

are untrue and were part of an "orchestrated discriminatory and retaliatory setup."[124]

Plaintiff disputes that she violated any City policy when she "violated the chain of

command" by emailing the Mayor with a question, pointing to two of her co-workers'

declarations wherein they say they have never heard of anyone receiving such a

reprimand.[125] And she disputes the reasons she received the counseling for falsifying time

records.  But even assuming the City was mistaken in giving Plaintiff these two

counselings, Plaintiff fails to show her employer did not honestly believe Plaintiff

engaged in the misconduct. And no evidence shows the City gave her these infractions

because of her race. A plaintiff cannot show pretext by simply showing that the employer

was incorrect in its decision; rather if the employer honestly believed that the employee

engaged in misconduct, even if it was mistaken such a belief, then the plaintiff's

discrimination claim cannot succeed.[126]

Plaintiff also points to her former supervisor's, Ms. Simmons', declaration wherein

she states that to her knowledge, Plaintiff's "mistakes were in line with those of other

cashiers,"[127] and the declaration of her co-worker Diane Jordan, who states she does not

---

[124] Pl.'s Response brief to Defendant's Motion for Summary Judgment, p. 20.

[125] See Jordan Decl. at ¶¶ 12 & 13 [Doc. 50-5]; Sandoval Decl. at ¶¶ 13 & 14 [Doc. 50-13].

[126] See Perry v. Batesville Casket Co., Inc., 551 F. App'x 987, 990 (11th Cir. 2014) ("A plaintiff's showing that the employer was simply incorrect in its decision is insufficient: if the employer honestly believed that the employee engaged in misconduct, even if it was mistaken in such a belief, no discrimination exists.") (citing Elrod v. Sears, Roebuck Co., 939 F.2d 1466, 1470 (11th Cir. 1991)).

[127] Simmons Decl. at ¶19 [Doc. 50-4].

believe Plaintiff made more errors than others.[128] But Jordan's belief is simply her opinion as Plaintiff's co-worker; it does not refute the evidence or knowledge her superiors held regarding the misconduct. And Simmons resigned on August 29, 2019, over 10 months before Plaintiff was terminated; thus, Simmons knew nothing of Plaintiff's performance-related issues, Plaintiff's attitude toward her co-workers, or her co-workers' complaints during the 10 months before Plaintiff was terminated. Moreover, Plaintiff was terminated under a different supervisor. "Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."[129]

Plaintiff also challenges the timing of the complaints against her and the City's investigation of those complaints and speculates that the City began manufacturing complaints against her in an effort to justify termination. But the record does not support this contention. Rather, the evidence supports the City's legitimate, non-discriminatory reason that Plaintiff was terminated because her performance declined, and her demeanor and attitude toward her co-workers deteriorated after she was not selected for the Senior CSR position. Plaintiff may disagree that she deserved the infractions and with how fellow co-workers perceived her, but her disagreements do not create an issue of pretext. Plaintiff fails to present any concrete evidence to rebut the City's proffered

---

[128] Jordan Decl. at ¶28.
[129] *Rojas*, 285 F.3d at 1343; *see also Chapman*, 229 F.3d at 1270 ("Different decision makers are entitled to be concerned about different things.").

reasons for her termination.

It is well established that "[a]n employer may fire an employee for a good reason, bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."[130] "Neither the plaintiff nor the court may recast the reason given by an employer for taking or failing to take a particular job action."[131] The burden is on Plaintiff to establish that her protected characteristic "actually motivated the employer's decision."[132] And Plaintiff has failed to carry her burden.

### 3. Convincing Mosaic

Plaintiff argues that even if she did not create a genuine issue of material fact dispute on her disparate treatment claim under the *McDonnell Douglas* framework, her claims survive under a convincing mosaic theory. Plaintiff is correct that the *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a discrimination claim based on circumstantial evidence.[133] Indeed, it "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."[134] The Eleventh Circuit has provided that "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic

---

[130] *Silvera*, 244 F.3d at 1262 (internal quotation marks omitted).

[131] *Id.* at 1260.

[132] *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*) (internal quotation marks omitted).

[133] *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768, n. 3 (11th Cir. 2005) (Title VII).

[134] *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal quotation omitted).

of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"[135] For summary judgment to be improper, the circumstantial evidence, when taken in the light most favorable to Plaintiff, must be "convincing" and must raise a "reasonable inference" the employer acted with discriminatory intent.[136] "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext."[137]

In addition to the arguments the Court has already addressed, Plaintiff relies on her failure to receive the Senior CSR position and points to suspicious timing to support a convincing mosaic of discriminatory termination. One week after Plaintiff filed her first EEOC Charge for not receiving the Senior CSR position, she received the two counselings for emailing the Mayor and falsifying her time records; counselings she contends were unjustified and never heard of by at least two of her co-workers. But, for the reasons already discussed, this evidence simply does not raise an inference of discrimination based on race or refute the City's legitimate, nondiscriminatory reasons for terminating Plaintiff's employment. Here, even when construed in the light most favorable to Plaintiff, the record simply does not support a reasonable inference of intentional

---

[135] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)).

[136] *Id.*

[137] *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Lewis*, 934 F.3d at 1185)).

discrimination based on Plaintiff's race.

## III.    RETALIATION CLAIM

Plaintiff also asserts the City terminated her in retaliation for having filed her second EEOC Charge on December 12, 2019, in violation of Title VII. Because the evidence is circumstantial, the *McDonnell Douglas* burden-shifting framework detailed above applies to Plaintiff's retaliation claims, although the elements of the *prima facie* case differ. "[T]o successfully allege a *prima facie* retaliation claim under Title VII, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression."[138]  "Once a *prima facie* case has been established, the [employer] may come forward with legitimate reasons for the employment action to negate the inference of retaliation."[139] If the employer is able to show legitimate reasons for the adverse employment action, the burden shifts back to the employee to demonstrate by a preponderance of the evidence that the employer's reasons are pretextual.[140]

Plaintiff fails to establish a genuine issue of material fact that her termination was caused by her engagement in statutorily protected conduct (her December 12, 2019 EEOC Charge) as opposed to her job performance issues and her co-workers' complaints of unprofessional conduct. "The burden of causation can be met by showing close temporal

---

[138] *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (citations omitted).

[139] *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310-11 (11th Cir. 2016) (citations omitted).

[140] *Id.*

proximity between the statutorily protected activity and the adverse employment action."[141] "But mere temporal proximity, without more, must be 'very close.'"[142]

The City terminated Plaintiff over six months after she filed her initial EEOC Charge on December 12, 2019. The Eleventh Circuit has advised "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."[143] Absent "other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."[144] Even if there was a connection between Plaintiff's statutorily protected activity and her termination, that connection is severed by Plaintiff's intervening misconduct. "Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action."[145] As explained in the Court's discussion above, no reasonable jury could find that the City's legitimate non-retaliatory reasons for terminating Plaintiff were pretextual. Thus, because Plaintiff fails to show a genuine factual dispute as to whether the City's termination of her was a pretext

---

[141] *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citation omitted).

[142] *Id.* (citation omitted).

[143] *Id.* at 1364.

[144] *Id.*; *see also Higdon*, 393 F.3d at 1220 (explaining the Supreme Court "cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection."); *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (observing, "[i]f there is a delay of more than three months between the two events, then the temporal proximity is not close enough, and the plaintiff must offer some other evidence tending to show causation.").

[145] *Henderson*, 442 F. App'x at 506; *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 521 (11th Cir. 2007) (agreeing "intervening acts of misconduct … severed the causal connection (if any) between [plaintiff's] initial complaint of discrimination and [defendant's] decision to terminate her employment.").

for unlawful retaliation, the City is entitled to summary judgment on Plaintiff's Title VII retaliation claim.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. 35] is **GRANTED**.

**SO ORDERED**, this 30th day of September, 2024.

S/  C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT